**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **DOUGLAS MANN,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | **Civil Action No._____** |
| | § | |
| **LIFE INSURANCE COMPANY OF NORTH AMERICA,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## ORIGINAL COMPLAINT

Douglas Mann ("Plaintiff" or "Mann") files this Complaint against Life Insurance Company of North America ("LINA").

**I.**
## PARTIES

1.     Plaintiff, Douglas Mann, is an individual and resident of Wilson County, Texas.

2.     LINA is an insurance company licensed to do business in Texas and is incorporated under the laws of the State of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.  LINA can be served with citation by serving its Attorney for Service, C T Corporation System, by certified mail, return receipt requested, at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

**II.**
## JURISDICTION AND VENUE OF ERISA CLAIMS

3.     This action against LINA arises under the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. §1001 *et. seq.*

4.     This Court has jurisdiction over the action pursuant to 29 U.S.C. § 1132(e)(1).

5.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the breach occurred in this district.

### III.
### FACTUAL BACKGROUND

**A.      Mann Ceased Working and LINA Approved His Claim for STD Benefits.**

6.      BBA Aviation Shared Services, Inc. ("BBA") employed Mann as a Field Service Representative/Mechanical Technician, which LINA erroneously defined as a medium-duty physical demand level occupation.  Mann's job description from BBA defined it as a heavy duty physical demand level job due to (1) BBA's lifting requirements outlined for the position—the ability to lift up to 70 pounds, (2) the requirement Mann walk, sit, drive, or stand for various periods of time, and (3) the ability to operate hoists, heavy parts, chemicals and fluids with the use of precision instruments, stringent housekeeping, and work area safety regulations and practices. In addition, the most analogous job description in the Dictionary of Occupational Titles ("DOT") also defined the occupation as heavy duty.

7.      Mann began his employment at BBA on July 25, 2011.  As a BBA employee, Mann was a participant in BBA's health and welfare benefit plan (the "Plan") that provided group short- and long-term disability ("LTD") and group life insurance with life premium of waiver ("LWOP") benefits to its employees.

8.      The Plan paid short-term disability benefits ("STD") and LTD benefits to qualified BBA employees through a group disability policy issued by LINA (the "Disability Policy") and life insurance benefits through a group life insurance policy also issued by LINA (the "Life Policy").

9.      While insured under the Disability and Life Policies, Mann experienced severe left leg and lower back pain and significant numbness and tingling in his extremities.  The pain and

neuropathy significantly affected his ability to sleep and he began to suffer disabling symptoms caused by his various diagnoses, including lumbar post laminectomy syndrome, lumbosacral radiculitis, idiopathic peripheral neuropathy, and lumbar spinal stenosis. Mann underwent surgery for a left lumbar laminectomy on November 12, 2015 and lumbar interbody fusion at the left side of L4-5 with pedicle screws on February 16, 2016.

10.    As a result of his lumbar laminectomy, Mann was forced to cease working on November 11, 2015.  Thereafter, he submitted a claim for STD benefits to LINA.

11.    On December 11, 2015, LINA approved Mann's claim for STD benefits effective November 19, 2015 because it concluded he could not perform the material duties of his own occupation. The amount of his STD benefit was $1,280.40 per week.  After approving his claim, LINA constantly reinvestigated Mann's eligibility for STD benefits, but based on Mann's solid medical evidence, LINA was forced to pay Mann STD benefits for the entire eligibility period— until May 8, 2016.

12.    During the period LINA paid Mann his STD benefits, LINA regularly requested medical records from Mann's physicians, including Dr. Machelle Williams, his family practitioner, and Dr. Guy Fogel, the orthopedic surgeon who performed Mann's November 2015 and February 2016 surgeries.

**B.    LINA Investigated Mann's Eligibility for LTD Benefits and Reviewed His Medical Records.**

13.    Before Mann's STD benefits expired, Ashley Flood, a LINA claims representative, spoke to Jamie Mann, Mann's wife, and erroneously advised her LINA did not have any information to suggest Mann had enrolled or was eligible for LTD benefits. Flood promised Mann's wife she would investigate whether Mann had been enrolled in LTD so that LINA could begin processing Mann's LTD claim.  Laura Ngyugen from BBA's human resources department

called LINA regarding Mann's enrollment in the LTD Plan.  LINA advised Ngyugen Mann was not eligible for LTD benefits, but Ngyugen insisted he was and said she would send proof he enrolled in the LTD Plan.  The proof she sent expressly indicated Mann had been enrolled in the LTD portion of the Disability Plan since January 1, 2013.  In other words, LINA's first crack at attempting to avoid paying Mann's benefits failed miserably.

14.     In April 2016, shortly before Mann's STD benefits were scheduled to end, LINA requested that Dr. Fogel, Mann's orthopedic surgeon, fill out a Medical Request Form, which he returned on May 6, 2016.  In the form, Dr. Fogel indicated the factors preventing Mann from returning to work were post-operative recovery from surgery Mann underwent on February 18, 2016, continued pain in his lower back and extremities, and his inability to recover from his November 2015 lumbar fusion surgery. Dr. Fogel opined that Mann was unable to perform any of his job functions and at home he could not lift greater than 10 pounds and he could never bend, twist, bend at waist, or climb stairs.

15.     Nyugen, a human resources representative for BBA, contacted LINA by email on April 28, 2016 to implore LINA to expedite its decision regarding Mann's eligibility for LTD benefits since his STD benefits had expired almost six weeks prior and Mann was experiencing a lapse in coverage. Ashley McCoy, a group claims associate, responded she would ensure LINA would move quickly to make a determination regarding his eligibility for LTD benefits.

16.     LINA subsequently began an investigation to determine if Mann was eligible for LTD benefits, but did not make an effort to render a decision quickly as McCoy promised.  After reviewing Mann's medical records, LINA finally approved his LTD claim on June 6, 2016—many months after Mann initially sought the benefits.   As a result of the approval, LINA automatically investigated whether he was eligible for life waiver of premium ("LWOP") benefits—the waiver

of the payment of his premiums while he was disabled—under his Life Policy. His LWOP benefits were approved on June 7, 2016.

17.     In order for a BBA employee to be eligible to participate in the LTD Plan,  they must meet the definition of "Disability/Disabled," which means the "Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

> **Definition of Disability/Disabled**
> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
> 1.  Unable to perform the material duties of his or her Regular Occupation; and
> 2.  Unable to earn 80% of more of his or her Indexed Earnings from working in his Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
> 1.   Unable to perform the material duties of any occupation for which he or she may reasonably become, qualified based on education, training, or experience; and
> 2.  Unable to earn 60% or more of his or Indexed Earnings."

18.     To receive LWOP benefits under the Life Plan, "Disability/Disabled" means "because of Injury or Sickness an Employee is unable to perform the material duties of his or her Regular Occupation, or is receiving disability benefits under the Employer's plan during the initial 9 months of Disability.  Thereafter, the Employee must be unable to perform the material duties of any occupation which he or she may reasonably become qualified based on education, training, or experience, or is subject to the terms of a Rehabilitation Plan approved by the Insurance Company."

19.     Mann's occupation required him to be responsive to field service activities on gas turbine powered aircraft, perform technical troubleshooting, solve problems, perform engine changes, and make engine repairs in the field.  The essential functions of the occupation (1) were to perform inspections, conduct airframe interface, perform ground operations, trouble-shoot,

implement the adjustment and repair of engines and related accessories; (2) conform results to the manufacturer's approved modification specifications in engines and related accessories; (3) monitor tooling calibrations for any equipment used to perform designated tasks; (4) perform any appropriate inspection he was certified to perform following completion of engine repairs and modifications and the inspections of powerplants following their installation into the aircraft for release to service; and (5) make airworthiness determinations and provide suitable certification for the work performed, including the final inspection and release to service of any work accomplished within the repair station's rating either at the repair station or at any other location.  To qualify for the occupation, Mann had to have the following cognitive abilities: (1) the ability to express or exchange ideas verbally with peers and clients; (2) the ability to get along with co-workers; (3) have effective written and communication skills; (4) express or exchange ideas by means of spoken word to impart oral information to convey detailed spoken instructions to other workers, customers or agents, accurate, loudly or quickly; and (5) possess a valid driver's license. The mandatory physical demands of Mann's occupation included (1) active work in field locations, both in hangars and on ramps; (2) exerting up to 50-70 pounds of force occasionally to lift, carry, push, pull or otherwise move objects; (3) the ability to walk, sit, drive or stand for various periods of time; and (4) reach by extending hands and arms in any direction. and (4) express or exchange ideas by means of spoken word to impart oral information to convey detailed spoken instructions to other workers, customers or agents, accurate, loudly or quickly.  Finally, the work environment for Mann's occupation required that he travel between 70-90% of the time (usually by driving), the ability to work in hangars, ramps and engine shop environments, including, handling hoists, heavy parts, chemicals and fluids with use of precision instruments, stringent housekeeping and work area safety regulations and practices to observe and maintain.

20.     After approving Mann's claim for LTD benefits, LINA regularly reinvestigated whether Mann remained disabled pursuant to the definition of disability under his LTD policy.

21.     On August 23, 2016—only 10 weeks after LINA approved Mann's benefits—it referred Mann's claim to Alletrice Gilliam, BNS, RN, to determine Mann's functional capacity.

22.     In her August 24, 2016 report, Gilliam concluded Mann's updated medical records supported restrictions and limitations preventing him from returning to work in his own occupation, mainly due to his severe pain and limited range of motion in his lumbar spine.

**C.     LINA Misrepresents and Ignores the Content of Mann's Medical Records.**

23.     Upon LINA's approval of Mann's STD benefits, LINA retained Allsup on Mann's behalf to apply for Social Security Disability Insurance ("SSDI").  As part of his application, Mann underwent an internal medicine consultative examination with Dr. Yu-Jie "Jack" Kuo on December 6, 2016.  Dr. Kuo observed Mann was only able to walk without assistance for about 30 yards before he had to stop and lean on something, he could not lift or carry more than 8 pounds, he could only stand for 5 minutes, and he could only sit for 5 minutes without having to change positions—*i.e.*, he could not perform a sedentary occupation.[1]

24.     In January 2017, Dr. Williams referred Mann for physical therapy at Momentum Physical Therapy. On January 17, 2017, Mann had an initial evaluation performed by physical therapist Kara Goode.  Goode noted in her report that Mann complained of difficulty walking for more than minimum distances, engaging in prolonged sitting and standing, that he had experienced a loss of function, and experienced symptoms of numbness, pain, stiffness, tingling and weakness. He described his own occupation as an aircraft mechanic, a job that required him to frequently

---

[1] The DOT provides a definition of a sedentary occupation, which requires exerting up to 10 pounds occasionally (up to 1/3 of a workday) and a negligible amount frequently (from 1/3 to 2/3 of a workday, sitting most of the time during the workday, and walking and standing for brief periods of time.

travel by car and airplane to trouble-shoot and repair different aircraft throughout the United States, Canada, and Mexico.  To perform his occupation, he had to lift greater than 75 pounds or greater occasionally, move and handle tools, operate heavy equipment, bend, stoop, maneuver in varied positions to work on all areas of an airplane or parts, drive a forklift, climb ladders, climb on top of airplanes, and travel by car and airplane at least 70% of the time.

25.     Upon examination, Goode noted Mann's pain was aggravated with upright sitting, stationary standing, and forward bending and that his pain was only relieved when he reclined or laid flat.  She provided the following functional impairments for Mann: he was unable to bend, he could lift objects with a maximum weight of 10 pounds, he could sit and stand for only 15 minutes at a time, and he could walk in the grocery store for a maximum of 20 minutes as long as he leaned on the shopping cart.  Goode stated that Mann's lumbar spine was hypermobile at L3-L4 and hypermobile and painful at L4-L5 and L5-S1.  Further, she stated Mann had limited range of motion, decreased hip and lower extremity flexibility, decreased strength in his core and hip/lower extremity musculature, and decreased functional endurance.  Finally, she noted that Mann greatly desired to return to work, but he was absolutely unable to perform the requirements of his occupation.

26.     On the same date as her initial evaluation of Mann, Goode completed a form entitled "Medical Opinion Re: Ability to Do Physical Activities," in which she noted Mann had participated in physical therapy on and off since 2015, he suffered from severe low back pain, and his prognosis was poor due to chronic pain.  She also noted Mann could only walk 4 blocks without rest, he could only continuously stand or sit for 15 minutes at a time, he could only sit for a total of less than 2 hours of an 8-hour workday, and he could only stand for 2 hours total during an 8-hour workday.  She further stated Mann needed a job that would allow him to change positions

from sitting, standing and walking at will and he would allow him to take unscheduled breaks throughout an 8-hour workday, which Goode estimated would occur every 30-45 minutes. She stressed that Mann had "good days" and "bad days" and if he returned to work he would likely be absent at least several times a month.

27.     Goode performed another evaluation of Mann on February 8, 2017 after he had undergone surgery for a transforaminal lumbar interbody fusion ("TLIF") with Dr. Fogel. Mann complained of continued pain after the surgery, including pain shooting down his left lower extremity to his feet and toes, as well as numbness and tingling at the top of his left foot, pain in his lumbar spine and lower back that radiated into his left hip and sometimes on his right hip. Although Mann previously experienced improvement in mobility and ease of walking due to physical therapy he engaged in in the past, Dr. Williams referred him for physical therapy again to address his pain, stiffness, and loss of function.  In describing Mann's functional activity, Goode opined Mann could only sit for 45 minutes continuously, he could not bend and he could only lift or carry light objects,  he had insomnia, and he could not drive. Goode observed that Mann's posture consisted of stiffened/guarded movements and protective posturing while changing positions and his gait showed decreased pelvic rotation and general stiffened body with mobility or ambulation. Upon testing Mann's active range of motion in his lumbar spine, she noted he had active range of motion of 40 percent in flexion, 10 percent in extension, 50 percent in side bending to the left and 3/5 gross strength in all those areas.  Upon testing Mann's muscle strength in his right abdominals, lower abdominals and paraspinals, she noted he had 3/5 strength and in his right gluteus medius he had 4/5 strength.  On his left side he had no muscle strength in his abdominals and lower abs, 3/5 strength in his paraspinals and 4/5 strength in his iliopsoas, gluteus medius, and gluteus maximus.  Goode also tested his joint mobility, which was firm at L1, L2, and his sacroiliac

joint was hypermobile at L4 and L5, all of which showed an increase in his stiffness since Goode last evaluated him.  Goode recommended that Mann set a goal to be able to increase his sustained sitting tolerance to one hour to improve his ability to possibility return to some type of work in the future and to be able to tolerate sustained standing for 30 minutes to improve tolerance to upright activities in his home.     She stressed these goals were "long term."

28.     In February 2017, as part of its continuing investigation as to whether Mann was disabled, LINA asked Dr. Williams to produce medical records and to complete a Physical Ability Assessment form. In her form dated February 1, 2017, she indicated Mann could only sit, stand, and walk for less than an hour a day, he could only reach overhead, to desk level, or below his waist for only 2 hours a day, and he could only lift, push, or pull objects weighing 10 pounds for less than an hour a day.

29.     Dr. Williams submitted medical records to LINA revealing the results of Mann's office visits.  During Mann's appointment with Dr. Williams on April 4, 2017, he reported he needed a referral to a spinal surgeon because his February 2016 TLIF surgery on his lumbar spine had been unsuccessful and he was in constant pain which was only treating with pain management, which included taking Tramadol, Oxycodone, and Gabapentin—all of which caused him cognitive deficits and prevented him from driving. Mann also told her it was difficult for him to do almost anything other than normal activities of daily living due to pain and left leg weakness, which made walking difficult and painful.  He also told Dr. Williams his pain was at its worst with prolonged sitting and standing and he only got relief from being in a supine position. He further told her his pain was the worse on his left side, which he described as a constant burning ache with weakness in his leg.

30.     During a June 13, 2017 office visit with Dr. Williams, Mann complained walking even short distances was painful and he was not able to sit for more than brief periods without having to stand up.  He also reported that his pain medication prevented him from driving and affected his ability to concentrate. Upon examination, Dr. Williams noted he had weakness in his left leg, chronic pain in his lumbar spine, parathesias to his anterior left lower extremities, and sedation and difficulty concentrating due to his pain medication.

31.     In a January 9, 2018 office visit with Dr. Williams, Mann reported he still had debilitating pain and had scheduled an appointment with a surgeon to see if there were any other surgical options available to him to ameliorate his chronic back pain.  He also advised her he continued to have days when he could not get out of bed or had to use a cane to walk. Upon examination, Dr. Williams reported Mann had decreased range of motion in rotation and forward bending, 2/5 muscle strength in his left lower extremities, and a gait with a limp.

32.     LINA also requested Dr. Fogel's medical records for Mann, which ranged in date from October 28, 2015 to August 21, 2018.  In his office visit note from October 28, 2015, Dr. Fogel listed Mann's diagnoses of displacement of intervertebral disc without myelopathy, spinal stenosis of lumbar region at left L4-L5, and lumbosacral radiculitis at left L4-L5. Upon physical examination, Dr. Fogel noted Mann had ankle dorsiflexion tibialis anterior 4/5, great toe extension extensor hallucis longus 4/5, no reflex in his left ankle, and decreased sensation on the lateral leg and dorsum of the foot.  Dr. Fogel also reviewed the results of Mann's recent lumbar MRI, which showed he had a L4-L5 disc herniation in the left foramen that likely compressed the L5 nerve roof in the lateral recess.  Based on his examination, Dr. Fogel recommended Mann get a nerve root block of the L5 nerve root on the left.  If that didn't work, he recommended Mann undergo laminotomy surgery at L4-L5 to decompress the L4-L5 lateral recess stenosis on the left.

33.     Pursuant to Dr. Fogle's recommendation, Mann underwent a L4-5 laminotomy on November 12, 2015.  During a follow-up visit,  Mann reported he did pretty well for a while after the surgery, but then gradually the tingling and painful sensation and dysesthesias returned in his left leg. Mann expressed anxiety about whether he would ever be able to return to work.

34.     During a December 23, 2015 appointment with Dr. Fogle, Mann expressed he still had pain in his left extremities.  Additionally,  on January 16, 2016, Mann had another follow-up appointment with Dr. Mann and complained the surgery had not relieved his pain and sensory loss. Dr. Fogel opined Mann had some far lateral foraminal stenosis that might be impinging on the L4 nerve root.

35.     Mann saw Dr. Fogel again on February 5, 2016. Dr. Fogel noted Mann's symptoms were severe and Mann had lost his ability to perform most of his normal activities of daily living. Dr. Fogel recommended Mann undergo a TLIF to the left and discussed the possibility of also performing a laminotomy if he found residual sciatic pain from unrelieved stenosis. Dr. Fogel also recommended Mann have an EMG.

36.     On February 18, 2016, while Mann was still receiving STD benefits, Dr. Fogel performed a post-laminectomy, L4-5 spondylolisthesis and stenosis operation on Mann.   Dr. Fogel's office visit notes after the surgery showed Mann had lumbar post-laminectomy syndrome at L4-5; idiopathic peripheral neuropathy with chronic L2-4 quadriceps weakness; displacement of lumbar intervertebral disc; spinal stenosis of his lumbar region at L4-5; transforaminal lumbar interbody fusion at L4-L5 on the left; and lumbar radiculitis and left EMG chronic L2-4 quadriceps weakness.

37.     On March 24, 2016, Mann saw Dr. Fogel for a follow-up from his surgery.  Dr. Fogle reviewed the results of Mann's most recent lumbar CT scan and concluded there had been

a buildup of bone at the left side at L4-L5 that had caused some acute irritation of his L5 nerve root. Dr. Fogel stressed most of Mann's symptoms were all in the L5 nerve root and caused him stinging, shocking pain into his leg and numbness in his foot—symptoms that had obviously worsened over time.  Dr. Fogel recommended Mann have a further decompression of his laminotomy on the left at L4-5 and remove Mann's left-sided screws because the fusion was complete and the screws could be connected to his current L5 radiculopathy. Dr. Fogle also discussed the possibility of expanding the laminectomy down along the course of the L5 nerve root which could give him some relief from his acute inflammation.

38.     On May 6, 2016, Dr. Fogel reviewed the EMG results with Mann, which showed he had chronic radiculopathy in his left thigh.  Dr. Fogel recommended treating Mann's continuing pain by using a spinal cord stimulator.  Upon physical examination, Dr. Fogel noted Mann had a mild forward list, dyskinesis of his lumbar spine motion, increased pain with forward flexion of the back, and increased pain with hyperextension and AP thrust.  Dr. Fogel also reported that Mann's range of motion showed his forward flexion was limited to 60 degrees and extension was 15 degrees, lateral flexion was 15 degrees on the left and right, and deep tendon reflexes were diminished at his knee and ankle.

39.     On August 12, 2017, per LINA's request, Dr. Fogel completed a PAA in which he indicated Mann was completely functionally impaired from performing his job due to his diagnoses of post laminectomy syndrome, acute low back pain, lumbar spinal stenosis, and lumbar radiculopathy.  He stated his opinions were based on his regular physical examinations of Mann.

40.     During an October 28, 2017 office visit with Dr. Fogel, Mann complained he was suffering from severe back pain and left buttock pain that was similar to his preoperative pain in November 2015.  He reported he was trying to walk every day, but it caused him to become very

stiff and he walked with a marked limp due to pain.  Dr. Fogel's physical examination of Mann was virtually identical to his May 6, 2016 appointment.

41.     At his January 10, 2018 office visit, Dr. Fogel noticed that Mann moved very poorly, he still limped when he walked, and it was difficult for him to move from a sitting to standing position. Mann reported his pain and radiculopathy were getting worse and his pain radiated down his left leg to his foot, which Dr. Fogel thought might be a combination of his polyneuropathy as well as L5 radiculopathy.  Dr. Fogel's physical examination revealed symptoms similar to those he found in Mann's last two appointments.

**D.     LINA'S Unreasonable and Arbitrary and Capricious Handling of Mann's Claim.**

42.     On June 3, 2016, LINA's vocational department considered what occupation in the national economy was most analogous to Mann's occupation at BBA using the DOT. LINA concluded Mann's occupation was similar to an Airframe and Power Plant Mechanic Field Service Representative. As with Mann's own occupation, LINA's vocational department considered the DOT position to be a medium physical demand level occupation, even though through the tasks listed for the position would have required Mann to sit, stand, walk, crawl, climb, stoop, crouch, reach, and kneel—all activities his treating physicians either opined he could never do or was significantly impaired in his ability to perform them. In addition, the DOT occupation was not similar to Mann's own occupation for the following reasons: it did not require him to lift up to 70 pounds occasionally, the ability to walk, sit, drive or stand for various periods of time required to work on equipment attached on or to be attached to aircraft and travel 70-90% of the time, either by driving or by airplane.  The DOT position did not include these physical demands and it was a blatant error for LINA to deem the two occupations sufficiently analogous in considering Mann's eligibility for benefits.

41.     In March 2017, LINA asked Mann to have his treating physical fill out another PAA form for purposes of LINA's investigation of his LTD benefits. In his March 20, 2017 PAA, Dr. Fogel indicated Mann could not lift anything heavier than 8 pounds and stressed Mann had no functional ability to return to work.

42.     In response to LINA's request for a PPA, Dr. Williams faxed a letter to LINA in which she confirmed that Mann's "specific limitations on his activity [were] provided on your provided form," that he had "difficulty ambulating" because he could only walk less than 50 feet without an assistive device, "he [was] unable to sit in a comfortable exam chair for the duration of an office visit, which is 15 minutes," and he was forced to change positions every 15 minutes and he could not stand for the rest of the visit without sitting again.

43.     On March 8, 2017, Dr. Holger Skerhut, an orthopedic surgeon drafted a letter to Dr. Williams to advise her that a recent MRI of Mann's lumbar spine showed the left facet was loose post-operatively and that his symptoms had not changed from his first pre-operative visit. He stated there was some calcification within the neuroforamina which happened post-operatively and that Mann's symptoms had not changed much after his surgery and he suspected Mann received some sort of injury to his sensory ganglion during his later disc herniation. He also stated he was pessimistic that a foraminotomy would improve his condition and would likely threaten the damaged nerve further.

44.     On May 3, 2017, Courtney Willis, a claims examiner assigned to Mann's LWOP claim, conducted a telephone interview with Mann who informed Willis that none of his medical providers had released him to work part or full-time. He advised Willis he had discussed the possibility of undergoing another surgery with Dr. Fogel in January 2018 due to his severe back pain and leg numbness. He also complained he suffered from brain fog, depression and side effects

due to his narcotic pain medication.  Mann told Willis he had performed the same occupation for 20 years and had an Associate's Degree and a certificate from a technical school to work as an aircraft mechanical technician.

45.     On that same day, LINA referred Mann's LWOP and LTD claims to Perry Glaze, one of its rehabilitation specialists, to perform a transferable skills analysis ("TSA") to determine if there were lighter duty jobs Mann could perform that met the LWOP and LTD wage requirement. Glaze could only identify one occupation that met these requirements—a material scheduler—a sedentary occupation.  Glaze expressly stated he relied upon the restrictions and limitations Dr. Jacobson provided for Mann and did not consider the restrictions and limitations Mann's own physicians had given him, review Mann's medical records, or speak to Mann or his treating physicians. Glaze stated Mann's restrictions and limitations precluded him from performing activities at a physical demand level greater than exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects and more than occasional waking or standing for brief periods of time. Glaze concluded Mann was able to perform the occupation of a material scheduler, a sedentary occupation, even though it would require Mann to sit for most of the day—a requirement that was contradicted by all of Mann's medical providers' conclusions that he could only sit for brief periods of time during a workday.

46.     On May 11, 2017, LINA referred Mann's claim to Helena Allen and Mandy White, RN for a file review.  After reviewing Mann's records, they concluded Mann's medical records, particularly his doctors' physical examination findings, supported that he was disabled under his Disability Policy. They recommended that LINA review Mann's return to work status again in November 2017.

47.     On the other hand, LINA terminated Mann's LWOP benefits on June 8, 2017—an obvious sign LINA intended to terminate Mann's LTD benefits after the definition of disability changed under the Disability Policy. In its letter explaining the bases for its decision, it listed the following reasons: (1) Dr. Williams' PPA form purportedly noted Mann could sit, stand, walk, lift and carry up to 10 pounds and push and pull for less than an hour, but it completely ignored the strict limitations Dr. Williams gave to Mann for sitting, standing, and walking; (2) in Dr. Fogel's office visit note from February 1, 2017, despite Mann's physical complaints and Dr. Fogel's findings upon examination, LINA erroneously stated the "neurology exam did not document abnormal findings"; and (3) Dr. Fogel completed a PPA form and stated Mann could not handle any items exceeding 8 pounds and that he had no work function at the time.

48.     LINA's reasons for terminating Mann's LWOP benefits obviously supported he was entitled to those benefits and did not provide a basis for terminating them, especially given the fact that Dr. Williams had concluded Mann could not sit for more than two hours a day—a restriction that precluded him from performing a sedentary occupation.

48.     Mann appealed LINA's decision to terminate his LWOP benefits and included letters from his wife, his son, his in-laws, and Dr. Williams, as well as updated medical records. On September 20, 2017, LINA acknowledged its receipt of Mann's appeal. LINA informed Mann it was sending his file to its Disability Appeals Team for a supposed "independent" review.

49.     Dr. Williams stated in her letter that based on her physical examinations of Mann, he had difficulty ambulating for more than 50 feet, he was unable to sit in an exam chair for a 15-minute office visit without having to stand up several times, and that the narcotic pain medication Mann was prescribed precluded him from driving and impaired his concentration and attention.

50.     In her September 11, 2017 letter, Mann's wife wrote LINA a letter to explain her husband's disabling condition and his inability to perform most of the activities he could perform prior to the development of his lower back pain and his first surgery.  She stressed that Dr. Williams' April 6, 2017 letter detailed Mann's psychical limitations, including the inability to sit, stand, or walk for any significant length of time.  She explained that Mann spent a minimum of one-third of his day in a supine position because he was unable to sit or stand for long periods without uncontrolled pain.  Although he was capable of minimal light physical activities in short spurts, when he did so, he had to lie back down again due to pain.  She also advised LINA that Mann frequently had days when he could not get out of bed at all.  She also included records from HEB pharmacy listing the medications Mann's doctors prescribed him.  Many of those medications are known to cause side effects such as brain fog, difficulty concentrating, and an inability to drive due to drowsiness and dizziness caused by taking narcotic pain medication.

51.     Mann's son, Waylon Mann, also wrote a letter on his father's behalf.  He stated his father experiences heavy breathing when he walked and was in severe pain. He also advised LINA that when his father attempts to try to engage in activities, he could not do it for long and he would be unable to get out of bed the next day.

52.     On October 4, 2017, Nancy Lesher, RN, created a nurse case manager plan, in which she indicated Mann had physical and cognitive symptoms and the primary symptom impacting his functionality was pain. She concluded Mann's claim should be referred to an occupational medicine specialist to determine his functional abilities and any restrictions and limitations he had that would prevent him from working a sedentary occupation in connection with his LWOP claim.

53.     On that same date, LINA advised Mann it was going to send his LWOP appeal to one of its employee Medical Directors for a purportedly "objective and independent review of the original claim decision."

54.     Dr. Roger Belcourt was assigned to perform the medical records review and he created a report dated October 10, 2017. He only reviewed medical records and did not speak to Mann or any of his medical providers.  After reviewing the office visit notes from Mann's various medical providers, he unsurprisingly and speciously concluded their opinions that Mann could not return to work were not well supported by medically acceptable clinical or laboratory diagnostic techniques and were inconsistent with the other substantial evidence in the claim file because: (1) the results of Mann's March 7, 2017 CT of his lumbar spine was inconsistent with Dr. Williams' physical examination findings that Mann had 3/5 left lower extremity weakness and Dr. Fogel's February 22, 2017 examination in which he documented full, normal, and symmetrical motor strength and negative bilateral straight leg test even though he failed to describe how the CT results were inconsistent with the physicians' findings; (2) there was purportedly no documentation of medication side effects including physical or cognitive examinations; (3) Dr. Fogel's March 24, 2017 office visit note indicated Mann's condition was not emergent indicating a stable surgical condition even though Mann was considering further surgery to his lumbar spine; despite the evince to the con and allegedly there was no documentation of decreased range of motion, strength, sensation, or reflexes of the upper extremities, vision or hearing, or consistent documentation of the inability to sit that would preclude the claimant from a sedentary level of activity—evidence that had no relevance to Mann's diagnoses.  Based on his unsupported findings, Dr. Belcourt concluded Mann could sit constantly with the ability to change positions for comfort and

occasionally stand, walk, and lift, carry, push and pull up to 10 pounds. Dr. Belcourt completely ignored the opinions of Dr. Williams and Dr. Fogel that Mann could not work in any capacity.

55.     In October 2017, LINA referred Mann's claim to Randy Norris, a vocational specialist, to perform another TSA related to his LWOP claim. Norris based his restrictions and limitations solely upon Dr. Belcourt's report, in which Dr. Belcourt stated Mann could sit constantly, stand and walk occasionally, reach constantly, lift, carry, push, and pull up to 10 pounds occasionally. Norris also stated that Mann did not require any medically necessary restrictions and limitations due to his complaints of pain. Norris concluded there were two sedentary jobs Mann could perform—a batch records clerk and an industrial order clerk—both of which required prolonged sitting, which Mann was unable to do.

56.     On that same date, LINA sent Mann a letter to advise him it was starting an investigation to determine whether he would be entitled to LTD benefits as of May 8, 2018, the date on which the definition of disability under the Disability Policy changed to the inability to perform the material duties of any occupation for which he is or may reasonably become, qualified based on education, training, or experience.

57.     On October 18, 2017, LINA referred Mann's claim to Young Chang, another vocational specialist, who performed a new TSA related to Mann's appeal of the denial of his LWOP benefits. Based on Dr. Belcourt's report, Chang concluded Mann was capable of consistently and reliably performing work activities for 8 hours per day, 5 days per week, for 40 hours per week with the following medically necessary work restrictions: sit constantly, with the ability to change positions for comfort and occasionally stand, walk, lift up to 10 pounds, climb stairs, stoop, kneel, crawl and use lower extremities on the left only. He concluded Mann did not require any medically necessary restrictions or limitations due to complaints of pain. He also

opined Mann could perform the sedentary occupations of batch-records clerk and industrial order clerk.

58.     LINA told Mann on October 20, 2017 that his appeal of the termination of his LWOP benefits had been denied based on the opinions of its Medical Director, its Vocational Rehabilitation Counselor, its Senior Appeal Specialist and its Appeals Specialist.  In particular, LINA focused on the opinions of Dr. Belcourt who opined Mann could occasionally stand, walk, lift, carry, push and pull 10 pounds, climb stairs, stoop, kneel, crawl and use lower extremities with the left foot for foot controls. He also opined Mann could be able to constantly reach, fine manipulate, simple and firm grasp, see, and hear.  He allegedly based these conclusions on Dr. Williams' and Dr. Fogel's office visit notes which purportedly did not support restrictions and limitations preventing Mann from performing a sedentary occupation—which they definitely did not.

59.      On November 20, 2017, LINA's referred Mann's LTD claim for a behavioral health review by K. Johnson, a licensed professional counselor, and Cecilia Valena, a RN, for a nurse case manager review.

60.     Valena completed a NCM Case Plan Documentation form, in which she stated Mann did not have a projected return to work date and recognized that Mann's back pain and left leg weakness with a limping gait were symptoms that impacted Mann's functionality.  More importantly, she stated Mann was unable to sit for 15 minutes without changing positions and could not stand, even though she claimed there was a difference of opinion among Mann's medical providers.  She referred Mann's claim to LINA's behavioral health services and to an occupational medicine physician to determine if Mann's updated medical records changed Dr. Belcourt's previous opinions.

61.     Although Johnson was instructed to speak to Dr. Williams, she merely reviewed Mann's medical records and did not attempt to contact Dr. Williams.  Johnson concluded Mann's medical records did not support any psychiatric or cognitive functional impairments.  She based this decision solely upon reviewing Mann's office visit notes from Dr. Williams. She never spoke to Dr. Williams as instructed.

62.     Based on Valena's recommendation, Mann's claim was referred to Gitry Heydebrand, Ph.D., an in-house medical director, to determine whether Mann's medical records supported a conclusion of functional limitations related to cognitive or psychological/psychiatric impairment. Dr. Heydebrand only reviewed office visit notes from Dr. Williams, and based on that review, he concluded Mann did not have any neuropsychological or psychiatric conditions that caused him to have restrictions or imitations. Although he acknowledged Dr. Williams had opined Mann's narcotic pain medication impaired his concentration and attention, he speciously claimed there were no clinical findings reflecting these deficits.  He also opined that Mann was only receiving low intensity treatment from Dr. Williams, which indicated he did not need more intense mental health treatment, and he stressed Mann had never been referred for a neuropsychological evaluation to determine the extent of any cognitive deficits.

63.     LINA then referred Mann's LTD claim to Cindy Herzog, a rehabilitation specialist, to perform two separate TSAs based on Dr. Heydebrand's conclusions regarding Mann's cognitive impairments and mental illness and Dr. Belcourt's opinions regarding Mann's physical restrictions and limitations.

64.     Herzog performed her TSA relating to Mann's cognitive and mental deficits based solely upon Dr. Heydebrand's report and the DOT.  She expressly stated her TSA focused solely upon Mann's cognitive restrictions and limitations and not his physical limitations.  Based on Dr.

Heydebrand's opinion that Mann had no medically necessary activity restrictions based on the clinical evidence in his medical records from a neuropsychological, psychiatric or psychological perspective, Herzog considered Mann's skills and abilities and identified two occupations from the DOT she believed he could perform—an airframe power plant mechanic—a medium duty occupation—and an avionics technician—a light duty position.  Other than Herzog's TSA, there is absolutely no evidence in the administrative record that Mann could perform a light or medium physical demand level occupation.

65.    In her November 30, 2017 TSA relating to Mann's physical restrictions and limitations, Herzog based her conclusions upon the conclusions of Dr. Belcourt and the DOT. Herzog relied heavily upon Dr. Belcourt's opinions, including, but not limited to, Mann's purported ability to consistently and reliably perform work activities for 7 hours per day, 5 days per week, for 40 hours per work week with the following medically necessary work activity restrictions: (1) Mann's purported ability to engage in constant sitting; (2) occasional standing and walking; (3) an ability to lift, carry, push and pull only up to 10 pounds; (4) using his lower extremities for foot controls on the left only; and (4) pain did not preclude Mann to have any restrictions and limitations preventing him from returning to work. Based on these conclusions, Herzog concluded Mann could perform the duties of a material scheduler, which required him to sit constantly—again a physical task all of his medical providers concluded he could not do.

66.    On December 8, 2017, LINA conducted a forum review of Mann's disability claim related to his psychiatric diagnoses and cognitive deficits. The forum members noted that although Dr. Williams diagnosed Mann with severe depression, she noted that his anxiety was under control. Dr. Williams also purportedly failed to specify any tasks Mann could not perform as a result of his mental diagnoses, including his complaints of deficits in concentration and attention. The forum

recommended that one of its occupational medicine medical directors perform another medical records review.

67.     LINA referred Mann's claim to Dr. Stephen Jacobson, an occupational medicine specialist, for a medical records review.  Dr. Jacobson, who only reviewed Mann's medical records and did not speak to Mann or his medical providers, mysteriously stated in his report that the "determination of whether an individual can or cannot perform an occupation is not a medical determination and is a vocational decision." Despite that statement, Dr. Jacobson went on to opine whether Mann could perform any occupation.  He opined there was no documentation of cognitive deficits to support cognitive restrictions and limitations from Mann's medication and his chronic pain. Dr. Jacobson concluded that Mann had the following restrictions and limitations based on his medical records: exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects and standing and walking on more than an occasional basis. Dr. Jacobson did not comment upon Mann's ability to sit for most of a workday—an absolutely necessary ability in order to perform a sedentary occupation.

68.     On December 18, 2017, LINA notified Mann that it had terminated his LTD benefits effective May 8, 2018 because he lacked evidence he was unable to perform the material duties of any occupation for which he was, or may reasonably become qualified based on his education, training or experience.  LINA again based its decision upon cherry-picked statements contained in Mann's medical records and ignored evidence supporting Mann's disability.  LINA based its decision on (1) the fact that the results from Mann's March 7, 2017 lumbar CT scan were allegedly inconsistent with Dr. Fogel's March 20, 2017 PAA, which indicated Mann was totally restricted from returning to work; (2) the lumbar CT scan was also allegedly inconsistent with Dr. Williams physical examinations which she noted showed Mann had 3/5 motor strength in his left

lower extremity and leg weakness; (3) LINA's "expert resource group" reviewed Mann's medical records and concluded there was not any consistent documentation of physical deficits in the upper extremities or his inability to sit for more than brief periods (even though Mann's physicians observed first-hand his difficulty sitting for longer than short periods of time); (4) Mann's medical records supported that he could frequently lift, carry, push, and pull and occasionally exert up to 10 pounds of force and walk or stand for brief periods of time—again a conclusion contrary to Dr. Williams' conclusions; and (5) the report of Dr. Heydebrand, LINA's medical director for neuropsychology and psychology, purportedly showed that Mann only had occasional insomnia, his anxiety was controlled with medication, and his depression was stable but not improved. Based on these reasons, LINA frivolously concluded there was no evidence that Mann had functional limitations due to cognitive or physical impairments.

69.     On November 1, 2018, the undersigned attorney appealed the denial of Mann's LTD benefits on his behalf.  As part of the appeal, Mann submitted updated medical records, a letter drafted by Dr. Fogel, a letter drafted by Ms. Goode, a letter drafted by Mann's in-laws, the Social Security Administration's approval of Mann's disability claim, the SSA's physical examination of Mann, and a Functional Capacity Examination ("FCE") performed by Dr. Marcus Hayes at Alivio Rehabilitation.

70.     Mann submitted medical records from Kara Goode, a physical therapist, who performed extensive physical examinations of Mann.  In January 2018, Dr. Williams referred Mann to Goode for an initial evaluation for physical therapy.  Based on her review of Mann's medical history, his subjective complaints, and her physical examination, Goode concluded Mann had the following restrictions and limitations: (1) unable to bend; (2) no lifting of objects weighing more than 10 pounds; (3) sitting and standing for only 15 minutes at a time; (3) chronic insomnia;

and (4) he was unable to perform work activities. She also examined Mann's lumbar spine and concluded his flexion was limited to 25%, his extension was limited to 10% due to severe pain, his right side bending was limited to 50% due to pain, his left side bending was limited to 60% due to stiffness and soreness, and he was moderately restricted in his flexibility in his hamstring, hip flexors, piriformis, iliotibial band, rectus femoris, quadratus, and lumbar paraspinals. Goode also noted that throughout her evaluation of Mann that he had to frequently change positions from sitting to standing due to pain and observed that his posture consisted of a forward head, rounded shoulders, and decreased lumbar lordosis. Upon examination of Mann's joint mobility in his lumbar spine, Goode found he was hypermobile at L3-L4 and hypermobile and had pain at L4-5 and L5-S1.

71.     Goode also filled out a form entitled "Medical Opinion Re: Ability to do Physical Activities." In the form, she stated Mann could only sit and stand for 15 minutes at a time for a total of approximately two hours total in an eight-hour workday. She also stated Mann would need to take unscheduled breaks during the workday every 30-45 minutes and the rest period would need to be for 30 minutes while Mann laid flat for pain relief. She further concluded Mann could never bend or twist at the waist and that his disability would require him to miss work more than twice a month. Mann submitted Goode's records as part of his appeal of the termination of his LTD benefits.

72.     Also on that day, Mann submitted a letter written by his father and mother-in-law, Judy and Paul Wiggington, in support of his appeal. They emphasized that before Mann began experiencing severe pain in his lower back, he had a strong work ethic, was an active and engaged parent, would help his in-laws fix damaged items in their house and work on their cars, and was involved in many sporting activities, including riding jet skis, boating, golfing swimming, and

sightseeing. The Wiggingtons advised LINA that prior to the onset of his back pain, he would travel a majority of the time for work. However, they explained that once Mann began suffering back and leg pains and underwent surgery that only increased his symptoms, he was no longer able to perform any of the activities he engaged in before the onset of his problems. They stated that Mann spent a good portion of his time in bed, particularly if he overexerted himself on a previous day when his symptoms were not as severe as usual.

73. Mann also submitted updated medical records from Dr. Fogel. On July 27, 2018, Dr. Fogel filled out a Restrictions and Limitations form for Mann. He noted that Mann could only occasionally (up to 33% of the day) sit, stand and walk as long has he could change positions every 10 to 15 minutes, never drive, kneel, crawl, or lift or carry more than 10 pounds.

74. During an August 15, 2018 office visit, Dr. Fogel noted he had not seen Mann in several months because Mann temporarily lost his health insurance, but had obtained insurance again and was interested in pursuing surgery. Dr. Fogel stressed Mann needed to undergo a laminectomy on the left at L4-5 because he continued to have significant L5 radiculopathy as well as chronic upper lumbar neuropathy. Dr. Fogel discussed the results of a February 21, 2018 MRI of Mann's lumbar spine, which showed a buildup of bone at the left side at L4-5 where he inserted the cage. Dr. Fogel believed this was causing some acute irritation of his L5 nerve root. He stated that all of Mann's symptoms are in the L5 nerve root with stinging, shocking pain into the leg and numbness in the foot which had worsened since Dr. Fogel last saw Mann.

75. Upon physical examination, Dr. Fogel reported Mann's gait had a mild list to the right, mild scoliosis, flattening of the lumbar spine, dyskinesis of the lumbar spine motion, increased pain with forward flexion of the back, and increased pain with hyperextension and AP thrust. Mann's range of motion was 70 degrees with forward flexion, 25 degrees with extension,

and 25 degrees lateral flexion on the left and right.  He also observed Mann's deep tendon reflexes were diminished at his left ankle, his left knee, and his right ankle.  He also had left weakness of ankle dorsiflexion and numbness of L5 distribution.

76.     Mann also submitted updated records from Goode, his physical therapist.  During an April 18, 2018 office visit, Goode noted Mann continued to see his pain management doctor and his current medications helped improve his pain only if he avoided certain positions and activities.  She also reported that Mann's laminectomy and lumbar fusion did very little to improve his functional status.  Her physical examination of Mann revealed he had decreased range of motion in rotation and forward bending in his back and 2/5 muscle strength in his left lower extremity.

77.     Further, Mann provided another letter authored by Goode, in which she stated she intended to present LINA with objective and subject evidence of Mann's disability.  Her physical evidence stemmed from her frequent examinations of Mann, which revealed he had 25% of normal range of motion ("ROM") in his lumbar spine upon forward flexion, he was limited by pain and stiffness caused by his last surgery, he also had limited extension (backward bending) by 90%, and side bending by about 50% of normal ROM.

78.     She stressed Mann's pain was located in his lower back and radiated down his left leg down to his foot.  This pain was aggravated with upright sitting, standing stationary, walking and with forward bending and his pain was only relieved by reclining or lying flat.  She also stressed Man could only tolerate sitting in a straight back chair or standing for 15 minutes.  Goode also advised LINA Mann had an Oswestery Low Back Disability Index Score of 78%, which meant he had a significantly reduced ability to perform daily and functional tasks.

79.    Goode concluded that not only could Mann not perform his previous own occupation, but that he could not perform any sedentary occupation either. She based this opinion on the fact that her physical examinations of Mann showed: (1) he could only sit for 5-10 minutes at a time for a total of 1 ½ hours a day; (2) he could not stand for 5-10 minutes at a time for a total of 1 ½ hours a day; (3) he could walk for 10 minutes at a time for 1 ½ hours a day; (4) he could lift a five pound object occasionally; and (5) he would not be able to tolerate positional changes for an entire 9-hour work day because he must recline or lay flat throughout the day in order to decrease his pain levels. All of these restrictions and limitations prevented Mann from returning to any capacity

80.    Mann also submitted the results of a Physical Performance Evaluation performed by Dr. Marcus Hayes from Alivio Rehabilitation on August 29, 2018. Based on his lengthy examination of Mann, Dr. Hayes concluded Mann could only lift 8 pounds from the floor and from the floor to his shoulder infrequently and 5 pounds occasionally, he could only lift 5 pound objects from the floor to overhead  pounds infrequently and 3 pounds occasionally, and he could push and pull objects weighing 10 pounds infrequently and 5 pounds occasionally. He also concluded Mann could only sit infrequently for 20 minutes at a time, stand for 8 minutes infrequently, and walk for 6 minutes infrequently.  He also opined Mann could never climb, squat, kneel or crawl.  Further, he noted Mann had a left antalgic gain and lumbar flexion limited to 30 degrees.  Based on his findings, Dr. Hayes concluded Mann performed at a sub-sedentary physical demand level and was precluded from performing sedentary work.

81.    On March 13, 2018, LINA unsurprisingly denied Mann's appeal despite the substantial evidence in his file supporting his disability as defined in the Disability Policy.  In its

letter explaining the bases for its decision, LINA advised Mann it referred his claim for a so-called "independent medical review" by an orthopedic surgeon and a psychiatrist.

82.     According to LINA, the orthopedic surgeon purportedly reviewed all of the medical records in Mann's claim file, but, based on information and belief, he did not speak to Mann or his medical providers.. In his report, he dismissed the results of Dr. Hayes's FCE because he claimed the results of the FCW were contradicted by Mann's radiologic studies or the physical examinations performed by his treating physicians and because the PPA did not indicate whether Mann's functional limitations were caused purely by physical discomfort or visible physical weakness.   The orthopedic surgeon acknowledged Mann's medical providers had repeatedly documented Mann had experienced a decrease in his ROM involving the lumbar spine in lumbar flexion and extension, gait alteration, and weakness and numbness involving the left lower extremity.   He also acknowledged that these conditions impacted his ability to engage in prolonged sitting, standing, walking, reaching below his waist, repetitive lifting, carrying, pushing, pulling, kneeling, crouching, crawling, or engaging in repetitive use of his left extremity for foot controls.

83.     Despite acknowledging these facts, the orthopedic surgeon frivolously concluded that Mann's most recent medical records purportedly showed he could frequently sit and occasionally walk and stand, but that he needed to have frequent position changes as needed. He also opined Mann could frequently lift, carry, push and pull up to 10 pounds and occasionally push and pull up to 20 pounds.

84.     The psychiatrist LINA hired to perform a medical review opined that Dr. Williams' conclusion that Mann had cognitive deficits as a result of his medication was allegedly not supported by medically acceptable clinical diagnostic techniques, including mental status examinations, psychological and/or neuropsychological testing and was inconsistent with other

information in his claim file. He also noted even though Mann had been diagnosed with depression and anxiety, Dr. Williams's office visit notes purportedly reflected Mann had appropriate mood and affect, did not document observations of tearfulness or other dysfunction related to psychiatric symptoms, and reflected his symptoms of anxiety and depression were stable. The psychiatrist further reported that the intensity of treatment for Mann's mental illnesses and cognitive difficulties was inconsistent with would have been expected in an impairing psychiatric conditions. Based upon information and belief, the psychiatrist only reviewed Mann's medical records and did not attempt to speak with his medical providers.

85. In its denial letter, LINA conceded Mann had been approved for Social Security Disability Insurance benefits, but it speciously contended that the SSA's judgment was inconsistent with its findings from Mann's claim file.

86. LINA's decision to terminate Mann's LTD benefits was utterly unreasonable and is not supported by the great weight of evidence in his claim file, including the language of the Disability and Life Policies. As a result of LINA's unsubstantiated decision, Mann was forced to hire the undersigned attorney to appeal LINA's decision to terminate his benefits and to file this Complaint. In addition, Mann's medical records unequivocally show his physical impairments are getting worse, not better.

87. Due to LINA's unreasonably and egregious conduct in terminating Mann's LTD benefits, he is entitled to receive the amount of this benefits from the date they were terminated to the present, interest, and attorney's fees.

### IV.
### COUNT ONE
### Breach of the Plans and Policy Provisions Claim

88. Pursuant to 29 U.S.C. § 1132 (a)(1)(B), Mann is entitled to life waiver of premium

and long-term disability benefits under the Disability Policy and Life Policy because he meets the applicable definitions of  disability included in the Policies.

89.     Mann has complied with his obligation to make proofs of claims in accordance with the Policies' requirements and he has exhausted his remedies under the Policies.

90.     Mann is entitled to have the Court conduct a trial *de novo* of the issues stated herein because LINA operated under a conflict of interest and it failed to conduct a full and fair review of Mann's claims.

91.     In the alternative, LINA's decision to deny Mann's benefits was arbitrary and capricious.

92.     Mann is entitled to life waiver of premium and long-term disability benefits because LINA's evaluations were so flawed and self-interested that its decisions to deny Mann benefits was unreasonable.

93.     The Disability Policy provides that in the instance where Mann is t disabled—and therefore unable to perform any occupation—then he is entitled to LTD benefits under the policy.

94.     The Life Policy provides that if Mann meets the definition of disability, which meant he was unable to perform the material duties of any occupation which he or she may reasonably become qualified based on education, training, or experience, then he is entitled to those benefits.

95.     Mann's claim files provide substantial evidence that he met the definition of disability under both Policies.

96.     LINA failed to consider much of Mann's medical evidence and thus it failed to provide Mann a full and fair review of his claims that took into account all comments, documents, records, and other information submitted to it by Mann and his medical providers.

**V.**
**COUNT TWO**
**Reasonable and Necessary Attorney's Fees**

97.     Pursuant to 29 U.S.C. § 1132(g)(1), Mann seeks an award for his reasonable and necessary attorney's fees in connection with the prosecution of this action.

**PRAYER**

WHEREFORE, Mann requests that the Court order:

1.      LINA to pay Mann the full employee benefits incurred and unpaid at the time of trial;

2.      LINA to restore Mann's employee benefits;

3.      LINA to pay Mann's reasonable attorney's fees incurred in pursuit of recovery of the benefits owed to Mann;

4.      LINA to pay Mann pre-judgment and post-judgment interest; and,

5.      Mann recover the cost of this action and such other further relief, as the Court may deem proper under the circumstances.

Respectfully Submitted,

**THE LAW OFFICE OF JESSICA TAYLOR**
14100 San Pedro, Suite 602
San Antonio, Texas 78232
(210) 402-4022 (Telephone)
(210) 402-1225  (Fax)


By:   /s/ *Jessica Taylor*
        JESSICA TAYLOR
        Texas State Bar No. 24013546
        jessica@jtaylorlaw.com

**ATTORNEY FOR PLAINTIFF**